**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA, ex rel.** | § | |
| **SIMONE SPARKS,** | § | **CIVIL ACTION NO. 6:14-cv-480** |
| | § | |
| **Plaintiff,** | § | *QUI TAM* COMPLAINT FOR |
| **v.** | § | VIOLATIONS OF FALSE CLAIMS ACT, |
| | § | 31 U.S.C. §§ 3729-3731 |
| **INTEGRACARE HOME HEALTH** | § | |
| **SERVICES, INC. and** | § | |
| **KINDRED HEALTHCARE, INC.,** | § | |
| | § | |
| **Defendants.** | § | JURY TRIAL DEMANDED |

## THIRD AMENDED COMPLAINT

Plaintiff, the Relator, SIMONE SPARKS, on behalf of the United States of America and the State of Texas, amends her Amended Complaint against Defendants INTEGRACARE HOME HEALTH SERVICES, INC. and KINDRED HEALTHCARE, INC.[1]

## I.  INTRODUCTION

1.      SIMONE SPARKS brings this action, on behalf of the United States of America to recover treble damages, civil penalties, attorneys' fees and costs, under the *qui tam* provisions of the False Claims Act ("FCA"), as amended, 31 U.S.C. §§ 3729-3733, for violations committed by Defendants. The violations arise out of the submission of fraudulent claims by Defendants for payment to Medicare. Relator also challenges referrals that were illegal under the Federal Anti-Kickback Laws, 42 U.S.C. § 1320a-7b.

2.      Defendants began operations in 1998. In 2012, IntegraCare Home Health Services was purchased by Kindred Healthcare. Based on the Relator's accounts, information and belief,

---

[1] Relator requested an extension to file this complaint but has not yet heard from the Court.  If the Court grants the extension, Relator can, with the Court's leave, withdraw this complaint and replace it with an amended version.

the billing practices she complains of herein were systemic and company-wide, based on a directive from corporate management to defraud Medicare or committed with corporate management's knowledge.

3.      Defendants have intentionally and knowingly billed and submitted, or caused to be billed and submitted, false claims to Medicare. As set forth below and in Relator's Disclosure documents, the false claims submitted to Medicare by Defendants were all part of an overarching scheme to "grow" Defendants' business by increasing patient enrollments by any means necessary and maximizing revenues through fraudulent billing. The practices that comprised the overarching scheme include: offering bribes to illegally obtain patient lists for purposes of enrolling patients on those lists in home healthcare ("HH") services with Defendants to be paid for by Medicare; illegal marketing tactics; false billings; billing for services not authorized by a doctor, not medically necessary, or not supported by medical documentation; and falsification of documentation for billing. In addition, Defendants knowingly enrolled patients who did not qualify for HH under Medicare or did not want HH, and billed Medicare and received payments for such patients. In total, these acts indicate that the actionable billing practices were part of a larger scheme directed, sanctioned, or at the very least knowingly tolerated by Defendants at the corporate level. Indeed, Ms. Sparks is informed by former colleagues who worked in the Tyler, Texas office where she worked that after she was fired from her job for bringing the fraudulent billing practices to light, IntegraCare's Vice President of Clinical Operations, Teonnie Connell, who was the one who fired her, announced to the entire office that the "roadblock to growth" had finally been removed.

4.      Ms. Sparks documented specific instances of fraudulent billing, solicitation and unethical activity. Ex-employees and, in one case, a current employee bolster Ms. Spark's claim

of a company-wide pattern of behavior, because they report similar wrongdoing in offices Ms.

Sparks did not audit, including the Waco and Houston offices.

5.      As is set forth in greater detail below, Plaintiff discovered a pervasive pattern of

improper billing at several offices of IntegraCare, and thereafter, Kindred, in which claims were

submitted to Medicare for HH services even though the corresponding patient files did not

contain the required physician certifications. Medicare expressly conditions payment for HH on

these certifications, and such certifications are material to Medicare's decision whether to pay

such claims.  Defendants' representations to Medicare that such certifications existed when they

did not were false claims in violation of the FCA.   To the extent certain submitted claims did not

expressly represent that the certifications existed, the representation to Medicare that HH

services were provided, while failing to disclose that the patient did not qualify for HH services

under Medicare regulations, or that HH services had not been ordered by a physician, or that

Medicare prerequisites for billing and payment for such services had not been met, rendered the

representations materially misleading, and thus false and fraudulent under the FCA.

6.      Since Ms. Sparks filed her First Amended Complaint, she has learned that the

Waco, Texas office of IntegraCare and Kindred engaged in the same fraudulent scheme as the

offices she or her biller audited. The fact that the same scheme is occurring in the Waco office

further bolsters Ms. Spark's claims, because it is more evidence that the scheme was company-

wide. In the Waco office—as in the offices Ms. Sparks personally observed—billers quit over

unethical and illegal billing practices that Kindred and IntegraCare forced them to use.   A former

Waco office manager, who was demoted to "scheduler," indicated she was provided only one_

day of training to learn to bill patient files. When the manager complained that she did not

receive adequate training, she was provided a video, along with other employees on how to bill Medicare. She did not find the video instructive.

7.      In addition, Relator and her attorneys have discovered that Girling, Kindred's Medicaid arm, engaged in a pattern of unethical solicitations of providers and patients similar to the fraud in the other offices. The Girling office in Houston, Texas billed at 98% utilization rates in September 2017, the month when Hurricane Harvey devastated the city. Such numbers are impossible, especially during the travel restrictions and disruption that occurred during that month. Girling Medicaid supervisors were approving "their own time" on payroll. Essentially, they would look at the system and, seeing that clients did not have enough hours billed in the system for a given month, log in and enter their own names into the system as having worked at the client/patient's home and then approve the hours, which were then billed to Medicaid or the Medicaid-approved HMO. The Girling billing practices mirror those at Kindred's Medicare offices.

8.      As is further detailed below, when Ms. Sparks brought the improper billing to the attention of IntegraCare management, it became clear that the pattern Ms. Sparks had uncovered reflected a broad-reaching fraudulent scheme at IntegraCare. As one member of IntegraCare's management team put it, "IntegraCare could not make money if it complied with Medicare billing requirements." This admission makes clear that both IntegraCare's non-compliance with Medicare requirements and its failure to disclose that non-compliance were knowing and intentional.

9.      The Girling supervisor for the Tyler office, Lisa Henry, brought the same type claims to the attention of the compliance office for the combined companies and the V.P. of Girling over unethical and illegal Medicaid solicitation by bringing on a new hire from another

home health company, paying them for bringing a client/patient list and paying more than double

for, in her words, the "wining and dining of providers." Such actions are illegal under both the

Medicare and Medicaid schemes. As with Ms. Sparks, Ms. Henry's complaints were dismissed

by the company as "overblown."

10.    Having been notified of the issues, IntegraCare management refused Plaintiff's

demands that IntegraCare "call back" the bills that had been improperly submitted, return the

payments to Medicare, and then resubmit the claims, if at all, only after proper doctors' orders

and certifications were obtained. Thus, IntergraCare knowingly failed to return the payments and

committed "reverse" False Claims Act violations as to all the claims it refused to call back.

Similarly, after Ms. Henry complained to compliance about the improper Medicaid solicitations

and illegal poaching of another company's case list, she was told it was no big deal and she was

making something out of nothing.

11.    Later, Kindred also declined to call back false claims it had specifically identified

in at least one of IntegraCare's offices, ultimately burying the issue by closing the offending

office. In so doing, Kindred knowingly committed "reverse" FCA violations as to all the claims

it refused to call back. The billers in the Waco office have now confirmed they were required to

bill final bills without face-to-face encounters and that they were forced to bill for patients who

did not have doctors' orders or were not home-bound or qualified for home health care, as the

term was defined prior to 2015. The billers resigned after the intimidation over having to bill

falsely and the pressure to remain quiet became too much for them to stand. The billers in Waco

did not bring documents with them or copy patients' names as Ms. Sparks did in her audits, but

their claims indicate an office unrelated to Ms. Sparks had the exact same billing problems as she

has outlined. The scheduler in the Waco office indicates that—when she informed management

she was unable to bill a file because of a lack of a face-to-face, missing doctors' orders, or no treatment plan—she was instructed to call the physician's office and obtain "verbal" permission to complete a Form 485. Management then had the office bill the file and complete the 485, whether the doctor's office agreed or not. On numerous occasions, the nurse or doctor from the office called to complain they had not provided permission for the completion of a Form 485. Of note, Form 485 is the doctor's orders and must be completed, signed and dated by the doctor. Permission cannot be obtained verbally. Defendants were simply engaging in a pattern of illegal conduct and taking advantage of the lack of training of their billers. This not only indicates a pattern of illegal conduct, but specific illegal bills were paid by Medicare to the Waco office.

12.     Defendants defrauded the Medicare program by submitting claims for reimbursement that made representations about the services provided, but failed to disclose Defendants' material violations of Medicare prerequisites for patients' qualification for HH, regulations, and billing requirements, which rendered Defendants' representations about the services it provided misleading.  In so doing, Defendants knowingly misrepresented their compliance with material requirements for the provision and payment of HH services that are so central to the provision of HH services that Medicare would have refused to pay such claims had it known of Defendants' violations.  Unaware of the material violations, Medicare paid the claims.

13.     Defendants submitted claims using payment codes corresponding to specific HH services, broken down by service discipline, referred to as "G-Codes."  In so doing, Defendants represented that they had provided specific types of treatment and services to patients.  But as detailed below, Defendants knowingly violated various material Medicare requirements, including prerequisites for patients to qualify for HH services in the first place, as well as

Medicare billing requirements, which Defendants knew were material to the Government's decision to pay the claims, and failed to disclose such violations.  By doing so, Defendants submitted false or fraudulent claims in violation of the FCA.

14.     This Complaint also describes Defendants' practices of inducing patient referrals in violation of the Federal Anti-Kickback provisions of 42 U.S.C. § 1320a-7b (sometimes referred to as the "Anti-Kickback Law"). The practices that induced improper referrals include, but are not limited to, the provision of gifts to employees of adult day care ("ADC") centers as bribes to obtain patient lists for purposes of enrolling patients who neither needed nor wanted, and in many cases did not qualify for, HH services. Relator was in no way a planner or initiator of the fraudulent compensation scheme nor has she performed any act to advance the scheme.

15.     As set forth in greater detail below, the scheme took shape at some point prior to Ms. Sparks' audits of the various offices, which began in August 2012, and continued at least through the time that Ms. Sparks was terminated, and may in fact continue to this day.

16.     As is detailed below, the participants in the scheme include, but are not limited to, Teonnie Connell, Karen Carter, Jarrod Davidson, Lisa Kilgore, Kim Boyd, Chris Shell, and the former manager of the Palestine office of IntegraCare, whose first name was Deborah, but whose last name Ms. Sparks does not currently recall.  The role that each of these participants played in the scheme is described in detail below.

## II. JURISDICTION AND VENUE

17.     This court has jurisdiction over the subject matter of this action under 31 U.S.C. §§ 3729 and 3730.

18.     Simone Sparks is the original source and has direct and independent knowledge of the information alleged herein, except for where the allegations specify that they are based upon

information obtained from persons with direct and independent knowledge. This suit is not based

on prior public disclosers of allegations or transactions in a criminal, civil, or administrative

hearing, lawsuit or investigation or in a Government Accounting Office or Auditor General's

report, hearing, audit, or investigation, or from the news media.

19.     Ms. Sparks personally audited several of Defendants' offices and thus has

personal knowledge of the illegal billing practices and Medicare fraud Defendants engaged in

during the relevant time. The files she audited had already been billed. All files documented in

this complaint involve final bills, billed at end of at least 60-day episodes. In addition, Ms.

Sparks received reports from her colleague, Carmen Bevel, who personally conducted audits in

the Palestine and Mt. Pleasant offices of IntegraCare and discovered similar illegal billing

practices and Medicare fraud in those offices as well. Relator's counsel has learned that the Waco

office employees were instructed to seek out specialists whenever the patient/client's regular

doctor would not certify the patient as qualified for home healthcare. Seeking multiple doctors

for home health status indicates illegal solicitation was occurring.

20.     Based on the fraud Ms. Sparks and Ms. Bevel personally observed in several of

Defendants' offices, and based on Relator's witnessing various elements of what was evidently

an overarching corporate scheme to "grow" the companies' business by any means necessary,

Relator concludes that the practices complained of herein are company-wide, all part of an

overarching scheme to enroll and bill for as many patients as possible, regardless of whether the

patients qualify for HH, need HH, want HH, are properly authorized to receive HH, or in fact do

receive HH. In addition, Relator's counsel has discovered that Defendants' Waco office was

"provided" (by an unknown source), a 40-page list of patients/clients, that a marketer pulled up

and the marketers were then directed to call. The Team Manager "initially" advised against the

use of the list as illegal solicitation but was overruled by management and the marketers were told to go ahead and call the patients. It turned out that many on the list were not actively in need of home healthcare, that some were already on home healthcare, and that some were, in fact, deceased. It appears that the list was generated by another Medicare facility, similar to the adult day care facilities in Ms. Sparks First Amended Complaint. The solicitation information in an unrelated office supports the solicitation claims in the Tyler and Houston/Beaumont area offices of IntegraCare and Kindred.

21.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732 because Defendants are authorized to transact business in, and are now transacting business in, this District. In addition, acts proscribed by 31 U.S.C. § 3729 occurred in this District.

22.     Venue is proper in the United States District of Eastern Texas because the Defendants conduct business in this District through their home health services business.

### III. PARTIES

23.     The United States of America is the plaintiff for whom recovery is sought for false and fraudulent claims submitted to federally funded government programs.

24.     Relator-Plaintiff Simone Sparks is a citizen and resident of the State of Texas. She brings this action on her own behalf and on behalf of the United States under 31 U.S.C. §§ 3730(b)(1) and 3730(h).

25.     Relator-Plaintiff Sparks is a Registered Nurse ("RN") with a Bachelor of Science in Nursing (BSN) degree, who started working for IntegraCare on March 19, 2012. Her job duties included acting as clinical manager of the Tyler, Texas office, and conducting audits of claims that had already been billed at other IntegraCare offices at the directive of management starting in August 2012.

26.     Defendant INTEGRACARE HOME HEALTH SERVICES, INC. is a home healthcare provider that offers skilled nursing, physical therapy, occupational therapy, speech therapy, home health aid, and medical social work. Defendant IntegraCare Home Health Services, Inc. has 47 offices across the State of Texas; the clear majority of its patients receive Medicare homebound benefits, which constitute most of IntegraCare's revenue.

27.     Defendant KINDRED HEALTHCARE, INC. a top-150 private employer in the United States, is a Fortune 500 healthcare services company based in Louisville, Kentucky with annual revenues of approximately $5 billion, and approximately 62,000 employees in 46 states.

28.     Defendant KINDRED HEALTHCARE, INC. agreed to buy IntegraCare from private equity firm Flexpoint Ford LLC on Aug. 20, 2012 and took over managing the operations of IntegraCare upon finalization of the acquisition.

## IV. BACKGROUND

**Medicare Requirements for the Qualification, Provision, Billing, and Payment for HH Services**

29.     To qualify for home healthcare services under Medicare, a patient must be under the care of a doctor, and must be receiving services under a plan of care established and reviewed regularly by a doctor. The patient must need, and a doctor must certify that the patient requires, one or more of the following services: Intermittent skilled nursing care (other than just drawing blood), physical therapy, speech-language pathology, or continued occupational therapy services. These services are covered by Medicare only when the services are specific, safe and an effective treatment for the patient condition. The amount, frequency, and period of the services need to be reasonable, and need to be complex or require qualified therapists to render the services safely and effectively. *See* Medicare Conditions of Participation.

30.     To bill Medicare and be paid for HH services, the following conditions must be met and documented in full:

1)      the patient must need a skilled licensed nurse or therapist to safely and effectively perform maintenance therapy for the patient's condition; **and**

2)      the home health agency caring for the patient must be Medicare-certified; **and**

3)      the patient must be "homebound," with a doctor certifying, with specificity, that the patient is homebound;

**and either:**

1)      the patient's condition must be expected to improve in a reasonable and generally-predictable period; **or**

2)      the patient must need a skilled clinician to safely and effectively manage a maintenance program for his or her condition.

31.     The foregoing prerequisites for a patient to qualify for HH services are so central Medicare's coverage of HH services that Medicare would not pay claims for HH if it knew that these conditions were not met.

32.     Moreover, the documentation of such prerequisites is so central Medicare's coverage of HH services that Medicare would not pay claims for HH if it knew that these conditions were not properly documented.

33.     According to Medicare regulations, a patient is "homebound" if the following conditions exist: Leaving home is not recommended because of patient's condition; patient's condition keeps him or her from leaving home without help (such as use of a wheelchair or walker, needing special transportation, or obtaining help from another person); leaving home

takes a considerable and taxing effort. Most of a patient's time must be spent at home to qualify for home healthcare, and the HH services must be rendered in the home.

34.     A patient's homebound status, as defined by the conditions listed above, is so central Medicare's coverage of HH services that Medicare would not pay claims for HH if it knew that these conditions were not met.

35.     Medicare requires four conditions be satisfied before a HH provider can bill for HH services: (1) the completion of outcome and assessment information ("OASIS"); (2) physician's verbal orders must be received and documented; (3) a plan of care must be sent to the physician, signed and returned to the HH provider; and (4) the first service must be delivered. All the conditions must be completed and documented before a bill can be submitted to Medicare. These conditions are so central Medicare's coverage of HH services that Medicare would not pay claims for HH if it knew that these conditions were not met.

36.     HH services are billed to Medicare in blocks of 60-day "episodes." The treating physician must establish a plan of care ("POC") and certify that HH services are needed in accordance with the POC every 60 days for additional episodes to be eligible for payment.

37.     While patient files need not contain complete documentation for an HHA to submit a RAP for a current episode, if a patient is in his or her second, third, or fourth episode, the files must have complete documentation for all prior episodes in order for the HHA to have legally submitted final bills and be paid for those prior episodes, and for a RAP for a subsequent episode to be submitted.

38.     If the proper documentation is not received during a 60-day episode, that episode may not be billed at the end of the episode, under Medicare regulations. Moreover, if a HH provider learns that a final bill was submitted and paid without proper documentation, that

provider is legally required to return the money to Medicare, to be paid once the billing is corrected with proper documentation.

39.     Despite these requirements, Defendants frequently billed for HH when the patient did not qualify for HH at all, where proper approval and documentation had not been received from the treating physician, where the required documentation was not present, and where the required renewal of approval for subsequent episodes had not been received. Defendants either falsely represented in their bills to Medicare that all such prerequisites were met when they were not, or represented that HH services had been provided to patients, without disclosing that these prerequisites were not met, thereby rendering their representations about the services provided materially misleading and therefore false and fraudulent under the FCA.

40.     In 42 CFR § 424, entitled "Conditions for Medicare Payment," the U.S. Government has expressly conditioned Medicare's payment for HH services on certification of the following, *inter alia*: (i) that "[t]he individual needs or needed intermittent skilled nursing care, or physical or speech therapy," (ii) that "Home health services were required because the individual was confined to the home except when receiving outpatient services," (iii) that "[a] plan for furnishing the services has been established and is periodically reviewed by a physician who is a doctor," and (iv) that "[t]he services were furnished while the individual was under the care of a physician." 42 CFR § 424.22(a)(1). Further:

> [t]he physician responsible for performing the initial certification must document that the face-to-face patient encounter … has occurred no more than 90 days prior to the home health start of care date or within 30 days of the start of the home health care by including the date of the encounter, and including an explanation of why the clinical findings of such encounter support that the patient is homebound and in need of either intermittent skilled nursing services or therapy services.

*Id.* § 424.22 (a)(1)(v).

13

41.     The mere fact that Medicare expressly conditions payment for HH services on the foregoing certifications, while not conclusive, strongly suggests that the certifications are material to Medicare's payment of such claims.  But beyond that, such certifications would logically be material to Medicare's decision to pay or not.  Clearly, Medicare would want to ensure that the services it is paying for are in fact "required" and "needed" by the patient, and clearly a face-to-face evaluation of such need would be the best, if not only, way to ensure that.

42.     A "face-to-face encounter" is an in-person consultation between the patient and the treating physician.  The documentation of such an encounter is required by Medicare regulations to describe in detail what services will be provided to the patient, what conditions the patient has, and what special care the patient requires, and to document the patient's homebound status – all matters that are material to whether Medicare will pay for such services.

43.     Moreover, the requirement that such face-to-face encounter take place within a limited period surrounding the dates of service is essential to Medicare's decision whether to pay for such services, as a patient's medical condition requiring in-home intermittent skilled nursing care, or physical or speech therapy, is likely to change over time, thus requiring evaluations to be a close to contemporaneous as possible. Further, Defendants knew and know that such certifications are so central to the need for HH services and Medicare's willingness to pay for such services that Medicare would not pay the claims if it knew that Defendants in fact were not compliant with the regulations.

44.     For these reasons, compliance with the requirements of a timely face-to-face evaluation determining that the other conditions are in fact met, as well as the actual establishment that such conditions for qualification for HH services are in fact met, are material to Medicare's decision whether to pay for such services or not.  Thus, Defendants' representation

14

that they provided specific HH services, while not disclosing that they failed to meet the various Medicare requirements for the provision and billing of such services, was materially misleading and thus false and fraudulent under the FCA.

45.     An expert witness Relator consulted indicates that Medicare, during the period of this complaint, routinely declined to pay any bill that it knew did not contain a completed face-to-face. Indeed, before 2015, over 50% of the claims Medicare refused to pay, it refused to pay because the face-to-face documentation was incomplete. The Medicare fiscal intermediary, Palmetto, also indicates that a large percentage of home health claims that are denied are denied because of a failure to document a complete face-to-face.

46.     Medicare pays for HH services based on a single, predetermined amount for each 60-day "episode." A "final claim" for HH services is a bill sent at the end of a 60-day "episode," even if the patient remains a patient of a home health agency ("HHA"). MEDICARE CLAIMS PROCESSING MANUAL ("MCPM") Ch. 10, § 10.1.10.4 ("The remaining … payment due to an HHA for an episode will be based on a claim submitted at the end of the 60-day period, or after the patient is discharged, whichever is earlier."). Significantly, "HHAs *may not submit this claim* until after all services are provided for the episode and *the physician has signed the plan of care and any subsequent verbal order*. Signed orders are *required every time a claim is submitted*, no matter what payment adjustment may apply." *Id.* (emphasis added).  Medicare's clear emphasis on the importance of these requirements, requiring them to be met *for claims to even be submitted*, strongly suggests that these requirements are material to Medicare's decision to pay or not to pay for HH services.

47.     The FCA defines "knowing" or "knowingly" to mean when a person, with respect to information, either has actual knowledge of the information, acts in deliberate ignorance of the

truth or falsity of the information, or acts in reckless disregard of the truth or falsity of the information. *See* 31 U.S.C. § 3729(b)(1)(A). No proof of specific intent to defraud is required. *Id*. § 3729(b)(1)(B). Defendants have, at the very least, acted with reckless disregard of the truth or falsity of their representations to the Government that the required conditions for payment have been met, or their representations that HH services have been provided without disclosing their non-compliance with Medicare regulations. Thus, Defendants have violated the FCA, both through presentment of a false claim under § 3729(a)(1), and submission of false records under 31 U.S.C. § 3729(a)(2).

48.     Further, the Affordable Care Act's 60-day repayment provision requires providers to return Medicare overpayments within 60 days of identifying them. The ACA further provides that the failure to make a timely refund to Medicare can serve as the basis for False Claims Act liability. 42 U.S.C. § 1320-7k(d)(3). Defendants who violate this provision are liable for a maximum FCA penalty of $21,563.00 for every improperly retained overpayment, as well as treble damages.

**IntegraCare's Internal Billing Procedures**

49.     While each IntegraCare office was responsible for ensuring that all prerequisites were met prior to Medicare being billed, ultimately it was the corporate headquarters that actually submitted bills to Medicare.  Thus, every false and fraudulent bill for HH services submitted to Medicare was submitted by IntegraCare corporate headquarters.

50.     IntegraCare's internal computer system is called "Home Care Home Base." When an episode ends, the computer system will walk a biller in a local office through the process of checking the patient's chart to be sure that all required elements are present. A bill is not

supposed to be released until the biller has verified that all required elements are present, complete, signed as necessary, and uploaded to the chart.

51.     The front page of the file that the local office keeps is a form on which a biller "checks off" that each required element is present, complete and attached, and which indicates the dates on which various elements were completed.

52.     Once the office staff verifies that the episode is ready to bill, the local office will "release" the chart at the branch level, and it is sent electronically to the corporate headquarters, where corporate bills directly to Medicare, using a standard program that all HH agencies use to interface with and bill to Medicare.

53.     During Ms. Sparks' employment at IntegraCare, there was no system at the corporate level whereby the charts were examined at that level to ensure that the required documentation was in fact attached to the file. Instead, corporate billers simply reviewed the chart on a computer, looking only at whether the charts were marked as "ready." Thus, bills were then submitted to Medicare representing that all items were completed as required, when in fact they were not.

54.     During her audits of various IntegraCare offices, Ms. Sparks discovered rampant fraudulent billing – that is, files that did not contain the required documentation, including but not limited to doctor's orders, consent forms from patients, and proper documentation of face-to-face encounters, sometimes referred to as a Face-to Face Encounter Acknowledgement Report ("face-to-face"), but which had been submitted to corporate headquarters to be billed to Medicare representing that all documentation was complete and proper.

55.     Because bills were automatically submitted to Medicare by the corporate headquarters, the bills that were sent to headquarters from the local offices were, in fact, billed to

Medicare despite the false representations that the proper documentation had been obtained and the proper procedures followed. Ms. Sparks also knows that final bills were submitted, because many of the fraudulent claims she audited were in their second or third episode, which means that the first episode or episodes had already been billed. In addition to the above, one-time IntegraCare regional manager, Karen Carter. informed Ms. Sparks that IntegraCare could not stay in business if it followed the billing requirements of the government that Ms. Sparks had informed IntegraCare they were required to follow. These irregularities in billing have been confirmed at the independent Waco office not audited by Ms. Sparks or her biller indicating the corporate wide practice was as she insisted it was, and confirming the fraudulent billing scheme outlined in both this and the First Amended Original Complaint.

56.     The Medicare billing program, "Homecare Homebase," can be "tricked" into thinking that a required document is attached to a file simply by checking off the item or entering a date on the main form indicating when the documentation was purportedly completed or received. For example, even if the required physician's orders have not been received and are not attached to the form, one can type in a false date claiming that that is the date on which the doctor's orders were received and entered, and Medicare will not be aware that the doctor's orders were never received, and will pay the claim based on the false date entered on the form.

57.     Medicare does not audit the bills submitted to it to ensure that the required certifications are in the patient files; instead, Medicare relies upon the representations, express and implied, of the HHAs that submit claims for HH services to Medicare.

58.     When Relator brought her findings to the attention of her direct supervisor and stated that IntegraCare was required to return all monies paid by Medicare under the improper billing, IntegraCare failed to take steps to repay the affected claims within 60 days after the

claims were identified by Ms. Sparks. This was a violation of the Affordable Care Act's 60-day repayment provision, set forth above.

## V.  FACTUAL ALLEGATIONS

### A.  Ms. Sparks' Audits of IntegraCare Offices Revealed Fraudulent Billing

59.     Relator-Plaintiff Sparks began working for IntegraCare on March 19, 2012. She was asked to help with billing audits in other IntegraCare offices starting in August 2012. Her job was to audit claims, including claims that were already billed. While auditing each of the Tyler, Denton, Palestine, and Mt. Pleasant offices of IntegraCare, she discovered discrepancies in the files indicating that all those offices had engaged in illegal billing practices. The bills were fraudulent because they falsified documentation to indicate that the requirements for billing Medicare for HH services had been met, when in fact they had not.  They also made representations that certain HH services has been provided, while failing to disclose IntegraCare's non-compliance with Medicare regulations and prerequisites for the provision, billing and payment of HH service.

60.     As set forth above, in order to submit a final bill to Medicare, the HH provider must: (1) confirm that the patient qualifies for home health services; (2) obtain a doctor's written, signed orders (or, if they are received telephonically by an RN, they must be written out by the RN and then signed by the doctor) for HH services and for the specific service; (3) obtain a plan of treatment signed by a physician; and (4) ensure that a face-to-face interview at which the treatment plan and services are discussed with the patient and agreed to has taken place within the time frame dictated by Medicare regulations. Ms. Sparks' audits of IntegraCare offices revealed that the clear majority of the bills submitted did not meet Medicare requirements to receive payment, and yet they were submitted with falsified statements that the requirements had

been met or without disclosing that such material requirements had not been met. Specifically, the bills indicated what HH services had purportedly been provided, but failed to disclose that Medicare's express requirements for a timely face-to-face interview, plan of treatment, written doctors' orders, or even that the patient qualified for HH services at all, had not been complied with.

61.     As is detailed below, Ms. Sparks discovered during her various audits that many of IntegraCare's claims were processed as if orders were attached and face-to-face forms were completed, but upon examination of the actual file, she found that the orders were not attached and face-to-face forms were sorely inadequate, if they were present at all. Correctly completed bills must include a doctor's signature as well as documentation that a face-to-face visit has been completed within the required time frame. In many instances, although there was no doctor's signature, no documentation of doctor's orders, and no documentation of a face-to-face visit, the claims were logged into the database as if all required information were attached. In other words, IntegraCare billed Medicare as if the claim were compliant with Medicare regulations, falsely representing that all conditions and prerequisites were met for the bill to be paid, or at the very least failing to disclose IntegraCare's non-compliance with material Medicare requirements while representing that specific HH services were provided. The concealment of the failure to comply with such regulations was material to the Government's decision whether to pay the claims or not, and rendered IntegraCare's representations about the HH services it provided materially misleading.  Under the FCA, this means that the billing was false and fraudulent.  Ms. Sparks discovered such fraudulent billing in *every* IntegraCare office she audited. The Relator's information that the Waco office was not properly billing under the same circumstances as the offices Ms. Sparks audited confirms her contentions that the practices were company-wide. The

solicitation information confirms that solicitation had become a way of doing business at

Kindred, both accepted and approved, despite its illegality.

62.     Ms. Sparks informed IntegraCare management of the fraudulent billing, and she

recommended they return the money to Medicare. Despite IntegraCare management's knowledge

about the fraudulent billing, IntegraCare denied Ms. Sparks' request that the monies be repaid to

Medicare. Likewise, Ms. Henry informed her management of the same thing, with the same

results.

63.     Karen Carter, Ms. Sparks' regional director, expressly stated to Ms. Sparks that

IntegraCare could not make money if it complied with Medicare billing requirements. This

suggests that, rather than the examples Ms. Sparks saw being the result of careless billing or

record-keeping, they were instead the result of a conscious decision and an intentional effort to

bill for as many patients as possible, regardless of whether they qualified for HH services or

whether other Medicare requirements were met, in order to enable IntegraCare to make money in

spite of restrictive Medicare requirements. Ms. Henry received the same type of response from

the V. P. and compliance officers of Girling regarding the company's Medicaid practice.

64.     Based on Ms. Carter's statement, the overwhelming number of discrepancies in

billing that Ms. Sparks witnessed first-hand at every IntegraCare office she visited, the pervasive,

structural, systemic flaws in IntegraCare's billing procedures and practices in terms of

inadequate training, a lack of backup systems or the implementation of any reliable means

whatsoever to ensure truthful, accurate and compliant billing, expressed corporate attitudes

towards improper marketing and admissions processes, and the specific refusal of both

IntegraCare and Kindred to refund monies paid by Medicare on improper claims when Ms.

Sparks brought those improprieties to the attention of upper management, Ms. Sparks believes

that the fraudulent practices she personally saw in a number of of IntegraCare's offices reflect a company-wide problem, and that the high percentage of fraudulent billing she witnessed first-hand can reasonably be extrapolated out to the rest of the IntegraCare offices. Indeed, the statement of Ms. Carter that *IntegraCare*—not just the Palestine office—could not make money if it complied with Medicare billing requirements, strongly suggests that these practices were company-wide and intentional.

65.     As for Defendant Kindred, shortly after acquiring IntegraCare, Kindred removed the only two auditors/trainers employed by IntegraCare, who might have been able to curtail or even stop the fraud, and moved them out of Texas to other Kindred offices, thereby perpetuating and enabling the fraudulent billing scheme at IntegraCare to continue.

66.     Moreover, as is also detailed below, Kindred compliance personnel saw first-hand the billing improprieties and non-compliance with Medicare regulations that were rampant in the Palestine office of IntegraCare, and yet Kindred did nothing to rectify the situation as required by Medicare regulations; *i.e.,* to return the funds paid by Medicare to IntegraCare on the improper and fraudulent claims that were submitted.  Instead, Kindred chose to bury the issue by shutting down the Palestine office.

**The Tyler Office**

67.     Ms. Sparks became the manager of the Tyler office in March 2012. During her time at IntegraCare/Kindred, Ms. Sparks ensured that her office did not engage in illegal billing. The Tyler officer under Ms. Spark's management was the only office that did not engage in illegal billing. Because she was a "roadblock to growth"—that is, she did not bill illegally—she was terminated. In early 2013, there was a large influx of patient referrals to the Tyler office through a marketer named Lisa Kilgore. The names of the patient referrals had been obtained

from "adult day care" ("ADC") centers called the Best Friends Adult Activity Center, located in

Longview, Texas ("Best Friends"), and one called Sunshine House, also located in Longview,

Texas. Based on the information obtained from the marketers, they obtained the names of the

Medicare-aged people attending these centers by providing various incentives to the center

personnel in the forms of manicure or pedicure certificates, facial certificates or gift cards. These

were provided in violation of the Medicare billing guidelines. In addition to the "gifts" provided

by the marketers for potential patient information, the marketers also provided or promised

services outside the scope of IntegraCare's skilled nursing services. Promises were made to

provide cleaning, cooking and housekeeping services as well as promises that the skilled nurses

would stay with the patients longer than allowed by any required service so the patient could

remain at home. These were promises outside the boundaries allowed by the act.

68.     The company did something similar in Houston and Waco offices. It paid a former

employee of another home health company to "poach" that company's patient list, solicit its

patients, and "wine and dine" providers. The Waco marketers were provided a forty-page list of

potential patients, likely from an ADC facility. Numerous employees who were not comfortable

with the company's practices have now come forward to provide this information.

69.     Like day care for children, an adult day care center provides care for elders or

others in need of assistance in a group environment in which the patients can socialize and

engage in supervised activities during the day.

70.     As one of the prerequisites to receiving HH is that the patient must be

homebound, Ms. Sparks was immediately curious as to whether the referred patients in fact

qualified for HH, since they were spending much of their day at the ADC centers rather than at

home. These concerns were confirmed when the nurses in the Tyler office were unable to contact the patients at home for weeks on end.

71.     The concerns about the ADC referrals were further exacerbated when many of the patients whom the nurses could contact indicated that they had no interest in HH and had no idea where IntegraCare had gotten their names and contact information. Numerous treating physicians of the ADC referrals also indicated that they had not requested and did not want their patients to receive HH.

72.     In addition, Ms. Kilgore and the other marketer, Kim Boyd, began harassing the referred patients with frequent telephone calls, trying to persuade them to sign up for HH. The office received several complaints from such patients asking that the harassment stop. Exhibit 7 contains numerous emails referring to specific patients who complained about such harassment. For the protection of the patients' privacy, the names of the patients have been redacted.

73.     Deeply concerned about the legitimacy of the ADC referrals, Ms. Sparks asked Ms. Kilgore whether the ADC centers provided skilled nursing or therapeutic services in addition to day care services. If so, IntegraCare could not also provide skilled services to the same patients and bill Medicare. Ms. Kilgore assured Ms. Sparks that the ADC centers did not provide such services.

74.     Ms. Kilgore's supervisor, Jarrod Davidson, also assured Ms. Sparks that Best Friends did not provide skilled nursing or therapeutic services in addition to day care, after visiting the facility with Ms. Kilgore. Mr. Davidson specifically stated to Ms. Sparks that he had investigated whether Best Friends provided skilled nursing or therapeutic services, and stated that he had ascertained that it did not.  This was false.

75.     Ms. Sparks later found out that, contrary to what Mr. Davidson had expressly told her, Best Friends did provide skilled nursing and therapeutic services to its clients, which disqualified IntegraCare from enrolling and billing for any patients "referred" from the ADC center.  Ms. Sparks found a brochure from Best Friends that Mr. Davidson or Ms. Kilgore had brought back from Best Friends, which expressly advertised that Best Friends provided skilled nursing and therapeutic services, meaning that, under Medicare regulations, IntegraCare could not bill for *any* of the referred patients from Best Friends.

76.     Nevertheless, numerous patients "referred" from both ADC centers were in fact enrolled in HH services at IntegraCare, and, based on IntegraCare's standard policies and practices, final bills were submitted to Medicare for those patients at the end of each 60-day episode. Again, this is confirmed by the 40-page list accumulated in Waco and the list of over 100 patients "poached" from another home healthcare company illegally in Houston/Beaumont.

77.     Examples of patients whose names were obtained at the ADC centers and were subsequently enrolled in HH services at IntegraCare, leading to the submission of RAPs within seven to ten days of the start of service and the submission of final claims at the end of each sixty-day episode are listed in the following paragraph, with patients identified by their initials and Medical Record Numbers rather than their names, in order to protect their Protected Health Information from public disclosure, include: A.H. TY100003510101; L. H.  TY100003502601; R.H. TY100003502501; P.M.  TY100003510401; E.M.  TY1000014401; J.W.  Y100003564401; D.B  TY100003500701; and C. M TY100003515301.

78.     Because none of these patients qualified for HH services under Medicare due to their participation at an ADC center that provided skilled nursing and therapeutic services, every final bill submitted at the end of each episode, represented to Medicare that services were

provided, while omitting that the provision of such services was in violation of Medicare regulations, thereby rendering the representations in final claims to be materially misleading and, thus, under the FCA, false and fraudulent. IntegraCare submitted final bills for these patients through its automated system.

79.     Ms. Sparks notified Ms. Carter of this fact, but Ms. Kilgore and Ms. Carter pushed the nurses in the Tyler office to admit the ADC referrals, regardless of whether they qualified for HH or had proper doctors' orders. Exhibit 7-A contains emails addressing these issues with respect to several specific patients, whose names have been redacted to protect their privacy. As explained in the previous paragraph, other nurses—not Ms. Sparks—eventually submitted final bills.

80.     Ultimately, Ms. Sparks demanded a meeting with Ms. Carter to discuss the issues raised by the improper referrals. Frustrated with Ms. Carter's inactivity in response to all of Ms. Sparks' complaint, Ms. Sparks told Ms. Carter that she had waited long enough for Ms. Carter to act, and that she could and would go over Ms. Carter's head, to the Kindred compliance department, to address the issues. Ms. Carter agreed to the meeting, which is discussed below.

81.     It was shortly after that meeting that Ms. Sparks was terminated from her job, as discussed further below.

82.     After Ms. Sparks was fired from the Tyler office, she was informed by Ms. Bevel that IntegraCare continued service to a patient, Patient Doe One[2], who had requested discharge from HH. Per Medicare guidelines, agencies must discharge patients from HH immediately upon

---

[2] Where specific patients' files, conditions and treatment are discussed herein, they are referred to as "Patient Doe __" to protect the privacy of the patient in compliance with the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), Pub.L. 104–191, 110 Stat. 1936.  To the extent the Court deems it necessary to know the actual identity of the individual patients referred to herein, Relator will produce the names and any unredacted files and documents the Court wishes to see for *in camera* review.

26

a patient's request. Ms. Bevel discovered that the coordinate note and discharge order were changed by marketers per Ms. Carter's request. Ms. Carter told Ms. Bevel that she wanted to keep the patient enrolled in HH with IntegraCare until the patient had had five visits, so that Medicare could be billed for the whole episode.

83.     Exhibit 7-B contains an email exchange regarding the patient who asked to be discharged but was not. The nurse who wrote the initial email stated that IntegraCare should not bill for the patient's care, as there was never any reason to admit the patient into HH. Further, the nurse noted that the physician update form had been "edited by the manager to NOT include the [discharge] request before it was sent to the physician." The patient's name has been redacted to protect the patient's privacy.

84.     The nurses in the Tyler office continued to contact Ms. Sparks about the unethical and illegal activities of the marketers and Ms. Carter in the Tyler office even after Ms. Sparks was terminated. They indicated to Ms. Sparks that Ms. Carter was pushing them to do things that they were not comfortable with, such as admitting patients who were clearly not homebound into HH. Ms. Sparks advised the nurses that they should not go through Ms. Carter any longer, as she would not do anything about the problems, and in fact they could wind up as Ms. Sparks had wound up—terminated from their employment. Ultimately, the nurses decided to file a formal complaint with the Kindred compliance hotline.

85.     Ms. Sparks is informed by her former coworkers that once the nurses filed the complaint, Kindred lawyers and compliance personnel came to the Tyler office to investigate. The nurses explained to the investigators the various issues with the ADC patients, and told the investigators that Ms. Sparks had been trying to stop the wrongful referrals, admissions, and billing, but was fired for her efforts.

27

86.     The Kindred compliance personnel instructed Ms. Bevel not to bill for any more of the ADC clients until the investigation was complete, and that the company would probably write off the services provided to those patients.  Kindred management (Ms. Carter and Ms. Kilgore), however, continued to contact Ms. Bevel and push her to bill for additional patients anyway. Ms. Bevel left IntegraCare before she could find out whether IntegraCare continued to bill for these patients in addition to the fraudulent bills it had already submitted or if subsequent ADC referrals had been written off. IntegraCare had already final billed for some of the clients.

**The Denton, Sherman, and Greensville Offices**

87.     In April or May of 2012, Ms. Sparks' Regional Director, Chris Shell, asked Ms. Sparks to assist with the billing in the Denton, Texas IntegraCare office, as the office had fallen behind with its Medicare billing. Ms. Sparks assisted via computer, without having to physically go to the Denton office.

88.     When Ms. Sparks electronically went through the various patient charts created for purposes of billing, it became clear to her that the Denton office's billing to Medicare was fraudulent. As noted above, to bill Medicare, there are strict requirements that dictate that four prerequisites be met, and the documentation of this must be filled out, signed, and attached to the patient's chart before a bill can be submitted to Medicare: the HH provider must (1) confirm that the patient qualifies for home health services; (2) obtain a doctor's written, signed orders (or, if they are received telephonically by an RN, they must be written out by the RN and then signed by the doctor) for home health services and for the specific service; (3) obtain a plan for treatment signed by a physician; and (4) ensure that an initial face-to-face interview has been conducted within the required time frame, at which the treatment plan and services are discussed with the patient and agreed to. The billing forms have a place for the biller to check off each of

28

the four items, representing that they have been completed and that the supporting documentation is attached to the form. The Medicare computer does not read the attached documents; rather, it only confirms that the checks have been marked, indicating that that all requirements for Medicare payment eligibility have been met, and thus, the billing is Medicare compliant. At the time of Ms. Spark's audits, the documents should have already been electronically scanned into the files. Kindred had a policy of scanning and shredding the documents each day so no paper charts were supposed to exist.

89.     Ms. Sparks' methodology in her audit of the Denton office was to examine the charts to ensure that all required documentation was properly filled out, signed, and attached. Ms. Sparks would electronically open the attachments to see if, in fact, a doctor's orders, a plan of treatment, and documentation of a face-to-face consultation were attached, as was attested to by IntegraCare billers, and as required by Medicare. In doing so, she discovered that as a general practice, IntegraCare billers in the Denton office checked the boxes indicating the attachments were present when in fact they were not – thereby falsely attesting to Medicare that the prerequisites for the billing and payment of HH services had all been met. She knew that these bills had been submitted to Medicare as final bills, because many of the patients were in their third or fourth episode, meaning that previous episodes had already been billed. Any billing over 60 days, even if it is the initial billing, has the same requirements as a final bill so that all documentation must be present.

90.     During each of her audits of IntegraCare offices, beginning in the Denton office, Ms. Sparks discovered that most bills she reviewed were missing at least one of the attachments, but almost universally, several of the attachments checked were not attached to the file. Thus, it had been falsely logged into the chart that all requirements were met when they were not. Ms.

Sparks informed Ms. Shell that most Denton bills were improper. She stated that IntegraCare needed to figure out why the office was consistently non-compliant, and that future bills had to be held until the orders and other documentation were in fact attached to the chart, and then billed once the files were complete. Ms. Shell said she would investigate and find out where the breakdown was and whether there needed to be a reeducation of the billers in the Denton office.

91.     Examples of the incomplete documentation that Ms. Sparks discovered in her audit of the Denton office, which contain Ms. Bevel's handwritten notes indicating what the deficiencies are, along with Claims Audit Reports for the same patients indicating that IntegraCare nevertheless final billed Medicare for those patients, are attached hereto as Exhibits 3-A through 3-E. The names of the specific patients to whom these files pertain have been redacted to protect their medical privacy.

92.     When Ms. Sparks subsequently volunteered to assist with the billing in the Sherman and Greensville offices in approximately May or June 2012, she found the same pattern of improper billing in many of the files she examined. As with the other offices she examined, Ms. Sparks discovered that the charts were not just sloppy – they were actively falsified. The charts expressly stated that doctors' orders and other required documentation were attached when in fact they were not. She reported to Ms. Shell what she had found and, again, Ms. Shell stated that she would find out where the breakdown was and reeducate the billers to fix the problem.

**The Palestine Office**

93.     In approximately January and February 2013, the Regional Vice President of Clinical Operations, South Division, Karen Carter, asked Ms. Sparks to pitch in with the billing in the Palestine office. Ms. Sparks did so remotely, via IntegraCare's internal computer system. Ms. Sparks found that many of the billings audited were improper or fraudulent. Examples of the

kinds of issues Ms. Sparks found in the files in the Palestine office are detailed in the EOE (End of Episode) Audit Tool/Check Off forms that are attached hereto as Exhibit 4. The names of the specific patients to whom each form pertains have been redacted to protect their medical privacy.

94.     Many of the Palestine office's patients whose files Ms. Sparks reviewed were in their second, third or fourth episodes of HH care. The previous episodes had already been billed to Medicare, despite the complete inadequacy of the documentation in their files. Some of these final bills were for patients who did not qualify for home healthcare.

95.     Because of the number of issues she was discovering, Ms. Sparks frequently emailed the manager of the Palestine office, whose first name was Deborah, but whose last name Ms. Sparks does not currently recall, to inform her of the discrepancies. Ms. Sparks CC'd Karen Carter, the Regional Vice President, on the emails to Deborah, to keep her informed of the developments.

96.     After sending many such emails, Ms. Sparks received a telephone call from Ms. Carter stating that Ms. Sparks should stop the audit of the Palestine office, because she was making Deborah "nervous" with all the issues she was finding. Ms. Sparks responded, "Are you kidding me? This is a huge fraud problem." Ms. Carter replied, "Just leave it up to me, I will handle it." Ms. Sparks responded, "Fine, it's now your headache, not mine."  Thus, a senior manager at IntegraCare was now well aware of the billing discrepancies in the Palestine office and had vowed to address the problem.

97.     Approximately two weeks later, Ms. Sparks received a call from Ms. Carter stating that the only RN in the Palestine office, April Sleziak, had "walked out," stating that there was far too much fraud in the office, and that she did not want to jeopardize her license by

participating in it in any way. Ms. Carter asked Ms. Sparks to come to the Palestine office and help Ms. Carter "clean up" the office's billing.

98.      Ms. Sparks agreed to help clean up the office's billing and agreed to go with Ms. Carter to the Palestine office to speak to the manager, Deborah.

99.      On the day they met in the Palestine office, Ms. Carter walked into Deborah's office and stated, "You've had a lot of problems in this office that you have not addressed, so we're letting you go." Ms. Sparks was surprised, and it appeared to Ms. Sparks that Deborah was as well. Deborah asked whether she could continue working on a part-time basis, but Ms. Carter refused. Once Deborah's husband had helped her remove all her personal belongings from the office, Ms. Carter stated to Ms. Sparks, "Now you can help me clean up this office. How often can you come here?"

100.      As the Palestine office was approximately a 90-minute drive from Ms. Sparks' home, and she still had responsibilities back in the Tyler office, she agreed to come to Palestine three days a week to help clean up the files.

101.      During this "clean up" effort, Ms. Sparks physically reviewed all the files of the approximately 30 clients who were listed on the office's patient "census," the list of clients served by the office. She inquired about the office's home health aide and licensed vocational nurse ("LVN"), Dawn Freeman, as to every patient what services were being provided and why, and reviewed the files to see whether all required documentation was present and properly filled out and signed.

102.      In Waco, the office manager was demoted to scheduler, but retained billing responsibilities for the office. She remained responsible for payroll, paying bills, and for making sure everything was being done to run the office. She only received one day of training on proper

billing. According to this scheduler, one day was insufficient to train her adequately on the Medicare codes or the requirements for billing. Later, IntegraCare provided her a video, but the video was also inadequate. During this time, the Waco employees were being told to approve both final bills and episodes that did not contain many of the Medicare requirements, especially face-to-face documentation. The scheduler was told they could call and obtain a verbal consent to the face-to-face. According to the scheduler, management and marketers told her to complete and file a Form 485 and that a verbal consent was sufficient. According to this scheduler, Defendants were contacted in Waco by doctors and nurses on "many" occasions. The doctors and nurses indicated they had not given verbal consent for home healthcare. Eventually, Kindred ran off most of the employees who were concerned about ethical conduct. `

103.    Many files in the Palestine office were incomplete. Many files lacked completed face-to-face forms, and Ms. Sparks was unable to locate the missing face-to-face forms in the office. Moreover, some face-to-face forms Ms. Sparks found in the files were blank, indicating that no adequate face-to-face meeting had occurred, but were signed nonetheless.

104.    Ms. Sparks discovered these discrepancies for many patients who were already in their second or third "episodes" of HH, and yet the prior episodes had already been billed to Medicare. Medicare regulations state that an HH agency may not initiate final billing until all prerequisites are met, and thus all such billing was improper.  Moreover, if a patient is in his or her second or third episode without the required documentation in the file, this means that not only the final bill for the last episode, but the final bill for every prior episode is also improper, representing to Medicare that certain HH services have been provided, while failing to disclose IntegraCare's non-compliance with Medicare regulations and requirements that are material to Medicare's decision to pay or not to pay for such services, thereby rendering such final bills and

33

RAPs misleading, and therefore false and fraudulent under the FCA. Contrary to Defendants' contention, after 60 days, the requirements for final bills apply to all billing. The documentation supplied by Plaintiff in the First Amended Complaint indicated that the final billing requirements were in place for each exhibit referenced in the Complaint.

105.    Ms. Sparks proceeded to make efforts to obtain the required documentation for all the incomplete files previously billed. This could not remedy the fraud already committed, but it could mitigate the damage. For those files missing signed doctor's orders, Ms. Sparks printed out the orders that had supposedly been verbally issued by the treating physicians and asked the physicians to sign them. Some physicians did so, but others stated that they did not in fact want their patients on HH, and that they had not ordered or authorized such services. This was the case for approximately five of the 30 patients listed in the Palestine office's census.

106.    Ms. Sparks informed Ms. Carter that for those patients whose physicians would not retroactively sign the treatment orders because they had not wanted or authorized HH for those patients, IntegraCare would have to do a "No Bill Discharge" – that is, the patient would have to be discharged from services, and IntegraCare would not be able to bill for any current services provided to those patients; prior services had already been fraudulently billed and would have to be "written off." Writing off the services, however, cannot cure the fraud.

107.    Thus, of the approximately 30 patients listed on the Palestine office's census, approximately five were never authorized to receive HH by a physician but were billed to Medicare anyway.

108.    The attached Exhibits 5-A through 5-H show examples of the fraudulent billings Ms. Sparks discovered in the Palestine office. Each example relates to a specific patient, but the names of the patients have been redacted to protect their privacy.

109.     Exhibit 5-A is a face-to-face form that lacks a plan of treatment and fails to state a reason for the determination that the patient is homebound that is recognized by Medicare – all it says is "Taxing effort." Taxing effort does not qualify for HH, so the face-to-face documentation is incomplete.

110.     Exhibit 5-B shows another incomplete face-to-face form, where no plan of treatment is indicated, and, like Exhibit 5-A, where asked what clinical findings indicate homebound status, states only that the patient has "considerable and taxing effort to leave the house." There is a notation on page 1 of Exhibit 5-B that indicates that IntegraCare billed for this patient despite the inadequate documentation. This was a notation written by Ms. Bevel during an audit.

111.     Exhibits 5-C, 5-D, and 5-E are all face-to-face forms lacking a plan of care and containing insufficient descriptions of the findings supporting homebound status, all of which indicate that IntegraCare nevertheless billed for this patient's care.

112.     Exhibit 5-F is a form that IntegraCare used with a patient instead of a proper face-to-face form, which does not contain the necessary information and documentation, but the Episode Billing Audit Report at the end of the exhibit nevertheless indicates that IntegraCare billed for extensive services.

113.     Similarly, Exhibit 5-G contains a Client Coordination Note Report instead of an official face-to-face form, which is incomplete in any event. Further, the Physical Therapy order is not signed by a doctor. The attached Episode Billing Audit Report indicates that IntegraCare billed Medicare for this patient.

114.   Exhibit 5-H contains an Episode Billing Audit Report for another patient, on which Ms. Bevel has written "Palestine Billed" and that there was "No face 2 face attached to chart."

115.   Each of the foregoing is a specific example of incomplete files, with explanations as to why they are incomplete; Exhibits 5-A, 5-B, 5-C, 5-D, 5-E, 5-F, and 5-G, all of which are incorporated herein by reference, are all examples of incomplete files for which IntegraCare billed Medicare, representing that specific HH services were provided to patients, while concealing that Medicare regulations and requirements material to Medicare's decision whether to pay for such services had not been met.

116.   In addition to the examples described in the preceding paragraphs and illustrated by Exhibits 5-A through 5-H hereto, further specific examples of the false and fraudulent billing that Ms. Sparks discovered in the Palestine office are set forth below.  In each instance, the billing described HH services provided but failed to disclose that Medicare regulations and requirements were not complied with, thereby rendering the descriptions of HH services misleading and the billings therefore false and fraudulent under the FCA.  In each example, patients are identified by Medical Record Numbers rather than their names, in order to protect their Protected Health Information from public disclosure:[3]

- Patient PAL00001974801 - treating physician Dr. Robert McFarlane.  Four episodes from 09/01/2011 – 4/24/2012 were billed that should not have been billed due to incomplete face-to-face forms, including an incomplete homebound

---

[3] Relator does not disclose patients' names herein in order to protect the privacy of the patient in compliance with the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), Pub.L. 104–191, 110 Stat. 1936.  To the extent the Court deems it necessary to know the actual identity of the individual patients referred to herein, Relator will produce the names and any unredacted files and documents the Court wishes to see for *in camera* review.

status statement. In addition, the clinical findings were not complete, only indicating a "need for monitoring and continued education," which does not qualify a patient for HH services under Medicare regulations.  All money billed during these four episodes is fraudulent and requires repayment by Defendant.

- Patient PAL00002986101 - treating physician Dr. Sidney Chadwell.  One episode from 9/10/12 – 11/08/12 was billed that should not have been billed due to incomplete face-to-face, including an incomplete homebound status statement. In addition, the clinical findings were not complete, only indicating a "need for ongoing assessment and self-management of patient's diagnosis," which does not qualify a patient for HH services under Medicare regulations.  These payments are fraudulent and must be repaid by Defendants.

- Patient PAL00003155101 - treating physician Delaney French.  Two episodes from 2/22/13 – 6/13/13 were billed despite an incomplete face-to-face; all four key areas must be complete and comprehensive, but one of the four key areas, the physician statement that is supposed to prescribe what services or treatments the HHA should provide to the patient, is missing altogether, and homebound status is not comprehensive enough to qualify for HH services under Medicare regulations. These are fraudulent and require repayment by the Defendants.

- Patient PAL00003990601 - treating physician Kristin Ault.  Episodes 6/28/13 through an unknown end date were billed despite an incomplete Face-To-Face. The physician statement that is supposed to prescribe what services or treatments the HHA should provide to the patient is missing altogether. These episodes are fraudulent and require repayment by Defendants.

- Patient PAL00001845801 - treating physician Glenn Dundas.  A minimum of two episodes starting on 6/24/11 were billed despite an incomplete Face-To-Face.  The physician used the boilerplate, computer-based Face-to- Face that the treating physician is supposed to use only as a guideline and then complete in his or her own words. The face-to-face encounter is required to take place 90 days prior to admission or 30 days after admission, so this one should have occurred on or before July 24, 2011.  The face-to-face is documented as having been received on 8/11/11, but there is no encounter date, and without this date the document is not valid.  Even with this the document, the file does not have a comprehensive homebound status completed by the physician, and thus does not qualify for payment under Medicare regulations. This documents fraudulent billing and the payments received by Defendants must be repaid.

- Patient PAL00002197201- treating physician Sidney Chadwell.  An episode with a start of service date of 11/16/2011 was billed despite an incomplete face-to-face.  As with the prior patient, treating physician used the boilerplate, computer- based Face-to- Face that the treating physician is supposed to use only as a guideline and then complete in his or her own words. The face-to-face encounter is required to be 90 days prior to admission or 30 days after admission, so this one should have occurred on or before July 24, 2011.  The face-to-face is documented as having been received on 12/16/11, but there is no encounter date, and without this date the document is not valid.  Even with this the document, the file does not have a comprehensive homebound status completed by the physician.  The patient evaluation was never signed by a physician, in violation of Medicare

38

requirements. This documents fraudulent billing and the Defendants must repay
these payments to Medicare.

- Patient PAL0003884101 - treating physician Alan Smith.  One episode from
6/5/13 -8/3/13 was billed with no face-to-face in the file. This documents
fraudulent billing and must be repaid by Defendants.

- Patient PAL00001902501 - treating physician Charles Dundas.  One episode from
12/6/11 – 2/03/12 billed with incomplete face-to-face: the physician statement
that is supposed to prescribe what services or treatments the HHA should provide
to the patient is missing altogether, and the homebound status is not
comprehensive enough to qualify per Medicare guidelines. The encounter date is
also incomplete with a "12/_/12 date," which is not in compliance with Medicare
guidelines. This documents fraudulent billing and must be repaid by Defendants.
Medicare regulations require that an episode that lasts over 60 days have the same
requirements as a final bill. This is over 60 days. It is fraudulent because of the
incomplete face-to-face, a material requirement of payment, the lack of HH status
documentation is enough to prevent payment but the episode does not contain a
completed plan of treatment which is crucial to payment. All are missing.

117.    Upon returning to Tyler, Ms. Sparks continued to attempt to convince her
employer to "call-back" the payments improperly received from Medicare. This would not
remedy the fraud that had already occurred but could mitigate the damage. She also monitored
the bills that were incomplete and not legal to bill. When she asked Ms. Carter whether she had
pushed the incomplete files through to be billed, Ms. Carter denied it.  However, the electronic
records indicated that such bills had in fact been submitted. Even when Ms. Sparks did

everything she could do to prevent further fraudulent billing by her employers, they went around her and billed illegal, non-documented files that were fraudulent to submit to Medicare.

118.    Moreover, for each of the foregoing patient files, payments were received but not returned within 60 days, in violation of the ACA's 60-day repayment provision.

119.    Ms. Sparks was informed by her former coworkers that, after she was terminated, the Tyler nurses informed Kindred about the problems in the Palestine office, and Kindred personnel went to the Palestine office to investigate. When the Kindred compliance people and lawyers went to the Palestine office, they decided to send all three of the Medicare auditors that IntegraCare had previously employed in the state of Texas to Palestine to try to clean it up. They worked in the Palestine office for approximately one month. Ultimately, the Palestine office was simply closed. To Ms. Sparks' knowledge, there was never a call-back of the money paid on the many improper bills that had been submitted to Medicare from the Palestine office. Defendants have provided the Court no indication or evidence that any call-back of fraudulently billed final bills ever occurred during the timeframe encompassed by the lawsuit. And even if there were a call-back, IntegraCare had already submitted fraudulent bills. Calling back the bills would preclude a "reverse FCA" violation, but it would not eliminate the original FCA violation

**Mt. Pleasant Audit – Done by Ms. Bevel After Ms. Sparks' Departure**

120.    Sometime after Ms. Sparks was fired in July 2013, Ms. Bevel was asked by the manager in the Mt. Pleasant office to help with their billing. The Mt. Pleasant office's biller had gone back to college, so they were short-handed and needed help. While assisting with the billing, Ms. Bevel found that many of the files were improper, and the billing that had been done with respect to those files was fraudulent. The files showed the same issues Ms. Sparks had previously found in other offices – missing or unsigned doctors' orders, missing or incomplete

face-to-face forms, missing consents to treatment, and so on. Examples of the incomplete documentation Ms. Bevel discovered in the Mt. Pleasant office, which contain Ms. Bevel's handwritten notes indicating what the deficiencies are, are attached hereto as Exhibits 8-A and 8-B. The names of the specific patients to whom these files pertain have been redacted to protect their medical privacy.

121. In addition to the examples described in the paragraph above and illustrated in Exhibits 8-A and 8-B, the following are examples of the billing that Ms. Bevel discovered in the Mt. Pleasant office that described services provided but failed to disclose that Medicare regulations and requirements were not complied with, thereby rendering the descriptions misleading and the billings false and fraudulent under the FCA:

- Patient MTP00002315001- treating physician Cynthia Brown. One episode with a start of service date of 1/7/2012 was billed despite an incomplete face-to-face. Physician used the boilerplate, computer-based face-to-face that the physician is supposed to use only as a guideline and then complete in his or her own words. The document does not have a comprehensive homebound status completed by the physician. The document was fraudulently billed and the money is owed to the government by Defendants.

- Patient MTP00002005901 - treating physician Jean Latortue. Two episodes with a start date of 6/10/12 were billed despite incomplete face-to-face. Physician used the boilerplate, computer-based face-to-face that the physician is supposed to use only as a guideline and then complete in his or her own words. The document does not have a comprehensive homebound status completed by the physician. The document demonstrates fraudulent billing and the Defendants owe the money back to the government.

- Same patient as above admitted 12/28/11.  Again, episode was billed despite an incomplete face-to-face: the physician statement that is supposed to prescribe what services or treatments the HHA should provide to the patient is missing altogether, and the description of the patient's purported homebound status was not comprehensive enough under Medicare regulations. Again, the billing is fraudulent and the money is owed to the government.

- Patient MTP00003177201 (unknown treating physician).  File expressly indicates "face-to-face incomplete," yet IntegraCare billed the episodes as if all documentation were complete. The billing is fraudulent and the Defendants owe the money back to the government.

- Patient MTP00002315001 - treating physician Cynthia Brown.  Episode billed for start of service date of 1/7/12, despite an incomplete Face-to- Face:  The physician statement that is supposed to prescribe what services or treatments the HHA should provide to the patient is blank, and homebound status is not comprehensive enough to qualify for HH services. Also, the admission consent frequency does not correspond with the plan of care frequency. The billing is fraudulent and Defendants owe the money from these episodes along with the required penalties and interests back to the government.

- Patient MTP00002633001 - treating physician Lee McKellar.  Episode billed for start of service date of 5/03/12, despite an incomplete face-to-face, as the physician statement that is supposed to prescribe what services or treatments the HHA should provide to the patient is blank. Also, homebound status in not comprehensive enough to qualify for HH services. Indicates fraudulent billing and that the money, penalties and interest are owed by the Defendants.

42

- Patient MTP00002486501 - treating physician Lewis King.  Episode billed for start of service date of 6/4/2012, despite an incomplete face-to-face, the physician statement that is supposed to prescribe what services or treatments the HHA should provide to the patient is blank. Also, homebound status in not comprehensive enough to qualify for HH services. Indicates fraudulent billing and that the money, penalties and interests are owed by the Defendants.

- Patient MTP00002061101 - treating physician Jean Latortue.   Episode billed for start of service date of 1/7/12, despite an incomplete face-to-face, as the physician statement that is supposed to prescribe what services or treatments the HHA should provide to the patient is blank. Also, homebound status in not comprehensive enough to qualify for HH services. The billing is fraudulent and Defendants owe the money, penalties and interests to the government.

- Patient MTP00002317401 - treating physician Karen Weis.   Episode billed for start of service date of 1/9/12, despite an incomplete face-to-face, the physician statement that is supposed to prescribe what services or treatments the HHA should provide to the patient is blank. Also, homebound status in not comprehensive enough to qualify for HH services. The billing is fraudulent and the Defendants owe the money, penalties and interests to the government.

- Patient MTP00002049801 - treating physician Maria Cromptom.  Episode billed for start of service date of 4/7/12 was billed despite an incomplete face-to-face: the physician statement that is supposed to prescribe what services or treatments the HHA should provide to the patient is blank.  Also, the description of the patient's purported homebound status is not comprehensive enough to qualify for HH services.  The Plan of

43

Care is not stamped the date received, as required by Medicare.  Admission paperwork is inaccurate in the frequency documented on the plan of care. The billing is fraudulent and the Defendants owe the money, penalties and interests.

- Patient MTP00002351701 - treating physician James Camp.  Episode billed for a start of service date of 1/18/12, despite incomplete face-to-face, incomplete description of the need for services— "Patient is Chair/bed bound" – is not adequate to qualify the patient as "homebound." This bill is fraudulent and requires repayment to the government of the money, penalties and interests.

122.     The submission of the above final bills and the failure to return the money is indicative of a "False Claim" as the term is defined in the ACT.

123.     When Ms. Bevel discovered that the necessary documentation was not in many of the patient files in the Mt. Pleasant office, she refused to bill the incomplete bills that had not yet been billed. Many had already been billed. A majority of the bills Ms. Bevel audited that were not legally billable had already been billed. On one example, involving a bill not yet submitted at the time, Ms. Bevel discovered that a form indicating that a face-to-face consultation with Patient Doe Two had occurred outside of the 30-day time limitation had been altered to indicate that it had occurred on an earlier date. This was done by "whiting out" the original date, writing in a new date, and then making a photocopy. When Ms. Bevel audited the file, she found both the photocopy and the original, whited-out version of the form, which had been completed by an IntegraCare marketer, Kim Boyd. When she confronted Ms. Carter about the discrepancy, Ms. Carter asked that Ms. Bevel go ahead and bill for the patient anyway. Ms. Bevel refused to do so, stating, "This is fraud."

124.    In approximately November 2013, Ms. Bevel resigned because she could no longer work in an environment where she was being pushed to do fraudulent billing. Importantly, even when she refused to bill herself, Ms. Bevel was unable to prevent the fraudulent billing as she was told the bills were submitted by the defendants despite her refusal to do so.

**B.  Illegal and Unethical Marketing Practices in Violation of the Federal Anti-Kickback Statute and HIPAA**

125.    In addition to the clinical staff employed in each IntegraCare office, each local office employs marketers – salespeople who work primarily in the field to bring in referrals of patients in need of HH who may be admitted under proper circumstances.

126.    The marketers for the Tyler office, which Ms. Sparks managed, had struggled to bring in referrals for some time. Ms. Sparks did not have direct authority over the marketers. After Kindred's acquisition of IntegraCare in 2012, the divisions of IntegraCare were rearranged by Kindred, and Jarrod Davidson was named sales director over 12 offices. As sales director, Mr. Davidson was the marketers' direct supervisor. To Ms. Sparks' knowledge, Mr. Davidson was a new hire brought in by Kindred. In late January 2013, Mr. Davidson consulted with Ms. Sparks via telephone regarding the poor performance of the marketer Kilgore. At that time, Ms. Sparks expressed her belief that Ms. Kilgore lacked understanding of HH services and regulations, that she did not seem to work most of the time and yet had higher mileage billings than most other marketers, and had failed to bring in adequate referrals. Ms. Kilgore had not brought in a single referral in approximately six months. During this conversation, Mr. Davidson stated that he agreed with Ms. Sparks' assessment. He then placed Lisa Kilgore on probation for her failure to bring in referrals.

127.   Within approximately a month, Mr. Davidson had hired a new marketer for the office, Kim Boyd. Ms. Sparks believes that Mr. Davidson intended to let Ms. Kilgore go as soon as Ms. Boyd got up to speed.

128.   Shortly thereafter, starting in approximately February 2013, Ms. Kilgore suddenly brought in over 40 referrals in two months, after failing to bring in a single referral in over six months.

129.   This sudden surge in referrals raised questions in Ms. Sparks' mind about the propriety of Ms. Kilgore's methods in obtaining them.

130.   After investigating the new referrals, Ms. Sparks concluded that they had been obtained in violation of the Federal Anti-Kickback Statute, 42 U.S.C. §1320a-7b(b)(1), and the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), Pub.L. 104–191, 110 Stat. 1936. Ms. Sparks has repeatedly informed Ms. Carter, who is part of the corporate management at IntegraCare, of the violations that led to the referrals, and yet nothing has been done to address the improper tactics.

131.   In a conversation with Ms. Sparks during Ms. Sparks' investigation of these ADC referrals, Ms. Kilgore stated that she did not begin marketing in ADC facilities until after a sales call with all the marketers in the region and the Regional Sales Director, Jarrod Davidson, which took place in or on approximately during February 2013. On that call, Mr. Davidson told the marketers about how successful another marketer in the Dallas market had been with these types of facilities. He instructed the sales team to find these "honey holes" in their own communities and get referrals.  Thus, rather than being the result of a "rogue" marketer, the scheme to recruit and enroll new patients from ADC centers was a concerted plan directed by the Regional Sales Director, if not by additional IntegraCare personnel further up the management chain of

46

command.  This scheme is confirmed by the 40-page patient sheet used in Waco to solicit patients similar to the ADC documents and the 100-plus patient list from the home health company "poached" out of the Beaumont/Houston offices.

132.    The participants in this scheme included, among others, Mr. Davidson, Ms. Kilgore, Ms. Carter, Ms. Boyd and Ms. Connell.  Ms. Connell, the corporate V. P. directed the scheme, or at least implicitly approved the scheme. When she was confronted with what was occurring, she both fired Ms. Sparks the employee who brought forth the fraudulent billing scheme and thereafter informing the combined offices of Tyler and Palestine that the "roadblock to your success has been removed." The circumstantial and direct evidence is that IntegraCare corporate directed that fraudulent billing was not only acceptable but encouraged and that "roadblocks" would be removed as long as the scheme was implemented. Unlike the fraudulent schemes in Home health billing where a physician is employed to sign false documents this scheme relies solely on the normal, everyday employees of Defendants who simply submit billing that is not proper under the guidelines but simply fraudulently indicate actions occurred which did not occur, documentation is present which is not, or that orders or status exists that does not relying on the corporation to fraudulently bill the episodes, RAPS and final bills and walk away with the money without Medicare auditing the bills. The scheme would have worked to the tune of over $1,500,000,000.00 during a six-year period if not for the honesty of Ms. Sparks. The involvement of the corporate V.P. and the regional sales manager, both of whom are still employed by Kindred, clearly implicate both IntegraCare and Kindred in the false billing scheme and false claims acts.

133.    During Ms. Sparks' investigation of Ms. Kilgore's 40 new referrals, Ms. Kilgore herself admitted to Ms. Sparks that during the two-month period from February to May 2013,

Ms. Kilgore obtained the referrals exclusively from a single ADC center in Longview, Texas. The patients likely were not homebound at all, based on the time they spent away from home, the nature of the facility, and the inability to contact the patients at home. In any event, Ms. Kilgore allowed they were spending their days away from home at the ADC center. Ms. Kilgore admitted that she had met with the ADC center's employees and offered them various gifts in exchange for the employees' giving Ms. Kilgore access to the ADC center's clients' files, which contained the name, Social Security number, Medicare number, and address of each ADC client. Ms. Kilgore asked for, and in exchange for her bribes was granted, access to the files of all ADC clients over the age of 65. This unauthorized invasion of patients' privacy in their health care records is a clear violation of HIPAA.

134.    Ms. Kilgore then brought a list of such clients back to the Tyler office, filled out referral forms with the information for each potential patient, and submitted it to IntegraCare's centralized intake office. Centralized intake would then search a Medicare database for each referred client's name, to check their coverage benefits and to ascertain whether they were already receiving HH services from another company. Ms. Kilgore then set out to admit every ADC client on the list that had coverage and was not already receiving HH services from another company.

135.    If the search reflected that the patient had Medicare coverage and was not already receiving HH, the next step would be to obtain signed orders from the treating doctor. Either Ms. Kilgore or one of the nurses in the office would contact the doctor for this purpose. When the nurses did so, they would tell the doctor that the patient had requested an evaluation for HH services, assuming that Ms. Kilgore had already spoken to the patient about HH. However, this was not the case. In fact, when the nurses would contact the patients themselves to inquire about

things like the start of care dates, the patients would often say that they had never spoken to anyone about HH, and often did not want such services at all.

136.    At that time, Ms. Sparks asked Ms. Kilgore to confirm that the ADC center was not providing skilled services, because in that case, IntegraCare's provision of such services would be duplicative and not eligible for payment by Medicare. Ms. Kilgore reassured Ms. Sparks that the ADC was not doing so, and Mr. Davidson later confirmed the same after visiting the facility with Ms. Kilgore.

137.    Months later, Ms. Sparks happened to find a pamphlet from the ADC in the Tyler office of IntegraCare that indicated that the ADC *did* provide skilled nursing services, and immediately stated that none of the referrals from the ADC could be admitted and billed because the services were duplicative and thus not eligible for payment by Medicare.

138.    The majority of these "potential patients" did not qualify for HH services, since they were not homebound. IntegraCare marketers pressed the nurses to admit these patients despite their status, and despite the lack of doctor's orders authorizing such admissions, and filed complaints with their direct report, Jarrod Davidson, against the nurses who refused to admit them.

139.    For example, Ms. Sparks and the field nurses in the Tyler office refused to admit the following patients due to their failure to qualify for HH under Medicare (the patients are identified only by initials and medical record numbers, to protect their privacy): M.T. (TY100003515501); J.S. (TY100003501001); W.R. (TY100003515401); J.C.L. (TY100003515101) (who was ultimately sent to Mt. Pleasant and admitted there); H.L.G. (TY100003508501); and S.R.S. (TY100003508501).

140.     When clinical staff in the Tyler office refused to admit non-complaint patients, Ms. Kilgore argued with the staff and Ms. Sparks and then filed complaints with Mr. Davidson.

141.     In addition, when certain patients were non-admitted upon their first referral to the Tyler office, they were admitted upon a second referral, after having been coached by the marketers to indicate that they are homebound. Examples of such patients are A.H. (TYI00003510101); L.H. (TYI00003502601); R.H. (TYI00003S02501); P.M. (YI00003510401); E.M. (1YI000014401); J.W. (TYI00003564401); and D.B. (TYI00003500701). Ms. Sparks was fired before she was able to find out whether these patients' services were actually billed to Medicare. However, Ms. Bevel indicated that Kindred management continued to demand she bill the ADC patients and eventually she, too, quit over the issue and was thereafter informed that a majority of the patients were actually billed by Defendants. .

142.     Ms. Sparks also received repeated complaints that the other marketer for the Tyler office, Ms. Boyd, engaged in many improper marketing activities and activities aimed at admitting as many new patients to HH with IntegraCare as possible, irrespective of their qualifications for such services. Ms. Boyd would misrepresent to patients what kinds of services IntegraCare provided, falsely stating that IntegraCare could provide housekeeping services, grocery shopping, and services that would normally be provided by a social worker or other provider.

143.     The clinical and other staff in the Tyler office also raised several other complaints about Ms. Boyd, including:

- The field nurses, Karen Monteagudo, RN and Melena Sandifer, RN complained that Ms. Boyd's offered bribes such as pedicures, manicures, and gift cards for

case managers to admit the patients she had brought in as referrals, irrespective as to whether they qualified for HH.

- Ms. Bevel complained that Ms. Boyd called her referrals frequently to request that they agree to receive HH services, to the point that it bordered on harassment. Three of Ms. Boyd's referrals called the office to request a stop to the frequent calls and stated that they did not want HH services.

- Ms. Bevel also complained that Ms. Boyd directed and assisted a client, Patient Doe Three, to change his health care provider to one accepted by IntegraCare in order to gain an admission. This cost the patient more money.

- Ms. Sparks herself witnessed and took issue with Ms. Boyd's acting beyond the scope of her authority by verbally taking care orders from doctors, since only nurses can legally take an order verbally from a doctor. When Ms. Boyd complained about the clinical staff failing to admit Patient Doe Four on the strength of the order that Ms. Boyd had purportedly taken over the telephone from a doctor, Ms. Sparks stated that as she was not a nurse, Ms. Boyd could not do so, and would have to get a nurse to take the order. Ms. Boyd continued to press Ms. Sparks to order the patient admitted despite this clear violation.

144.    In addition, various clinical staff members raised the following issues regarding both Ms. Boyd and Ms. Kilgore:

- Ms. Bevel complained about both marketers' inability to get orders signed by doctors in a timely manner, causing office billing to exceed accepted company standards for billing promptly. Ms. Sparks requested that marketers be retrained

regarding the process of orders and instructing doctors to complete face-to-face requirements.

- The field nurses complained that both IntegraCare marketers falsely promised potential patients hearing aids, Life Alert devices, and housekeeping services at no cost to them if patients agreed to home health services, in violation of HIPAA and Medicare regulations, along with being dishonest (as such perks were not in fact available). Marketers also pushed cardiac programs, promising patients free equipment when they signed up.

- Ms. Bevel complained, and Ms. Sparks observed, that Ms. Kilgore regularly misinformed doctors about the scope of HH, while not understanding the services herself.

- The field nurses complained that both marketers made promises to patients while failing to inform the clinical staff. As a result, when clinical staff failed to arrive at the times promised to them by the marketers or without the supplies the patients were promised, the patients reacted with anger towards the clinical staff.

145.    While Ms. Sparks repeatedly raised these issues with Ms. Carter, Ms. Kilgore and Ms. Boyd themselves filed complaints with Mr. Davidson against their colleagues in the office for refusing to admit the patients they brought in. Mr. Davidson repeatedly took the marketers' sides in these disputes, pushing the staff to admit as many patients as possible, irrespective of the issues with the referrals.

146.    In addition, after Ms. Sparks was terminated, she discovered that the marketers had altered at least one patient's (Patient Doe Five's) documentation regarding crucial information, such as the required face-to-face meeting, in order to qualify for payment by

Medicare and the services requested by their treating physicians. As noted above, Medicare

requirements dictate that a face-to-face consultation must take place between 90 days prior to

admission or 30 days after admission to qualify for payment by Medicare. Ms. Bevel noticed that

the date on the face-to-face form for Patient Doe Five had been altered to indicate that such a

consultation had taken place within the required time frame when in fact it had not. Ms. Bevel

was able to see that the document had been changed because she received the original document

on which the correct date had been "whited out," and a new date written in. Ms. Bevel was

informed the patient was billed and processed, even though alteration of medical records is

illegal.

147.    Marketers were informed by several clinical staff members and Ms. Sparks of

Medicare's home health care regulations, yet continued to blatantly ignore these mandates while

violating HIPAA regulations regarding patient's privacy.

148.    When Ms. Sparks reported these issues to IntegraCare management, specifically,

Ms. Carter, Ms. Carter sided with the marketers regarding conflicts between the marketers and

clinical staff, putting pressure on clinical staff to admit the patients the marketers wanted

admitted, despite the patients' non-homebound status and the lack of signed doctors' orders.

149.    On June 18 and 19, 2013, Ms. Sparks attended the IntegraCare regional

conference in Waco, Texas. During a presentation to the whole region by Mr. Davidson's

superior, the sales area director, he focused on all the ADC referrals in the Tyler office, and stated

that they were improper. He said that marketers should not enter referrals until doctors' orders

have been received; until then, it is nothing more than a "lead."

150.    During one of the breaks at the regional conference, Ms. Kilgore approached Ms.

Sparks and complained to her about not admitting one of her ADC patients, Patient Doe Six.

53

That same day, Nurse Monteagudo sent Ms. Sparks text messages stating that Patient Doe Six was not homebound, and thus could not be admitted. Ms. Sparks reminded Ms. Kilgore that patients must be admitted at home, and stated that Ms. Monteagudo had spent three days trying to reach this particular patient at home, which brought into question the homebound status of the referral.

151.    On Friday, June 21, 2013, at Ms. Sparks' request, Karen Carter, Regional Vice President of Clinical Operations, South Region, came to the Tyler office to discuss the issues that had arisen regarding the marketing staff. Each of the complaints listed above were expressly raised by the clinical staff to Ms. Carter during that meeting.

152.    The biggest concern expressed by the clinical staff was that they were being pushed in an unethical direction with potential illegal circumstances, and feared they were jeopardizing their nursing licenses.

153.    Because of the foregoing issues raised at the meeting, Ms. Sparks requested that the marketers be trained correctly on policies and procedures not only of the company, but also of Medicare.

154.    Following the meeting, Ms. Carter promised Ms. Sparks that she would come back to the Tyler office every Wednesday to do training with the sales team regarding Medicare regulations. While Ms. Sparks believed Ms. Carter would be teaching proper compliance with Medicare regulations, she later discovered through Ms. Bevel that, to the contrary, Ms. Carter's goal was to *increase* admissions regardless of whether the patients qualified for HH or not, due to the fact that both she and Mr. Davidson would receive financial bonuses for meeting or exceeding admission goals set by the corporation.

155.    On Wednesday, June 26, 2013, Ms. Carter came to the Tyler office to conduct training. Ms. Sparks later discovered, after speaking to Ms. Carter herself, that Ms. Carter did not train marketers in correct Medicare home health regulations; rather, Ms. Carter went over a process for orders, and discussed the type of patients the marketers seemed to be obtaining. Ms. Carter said that she had told the marketers to stop making promises they could not keep to patients.

156.    The following Wednesday, July 3, 2013, Ms. Carter did not come to the Tyler office as she had promised. Ms. Sparks saw no changes in the marketers' behavior. Ms. Sparks was still seeing that HH orders were not being signed by physicians in many instances. Despite that Medicare regulations state that "orders [are] to be signed in 21 days," some outstanding, unsigned orders were over three months old, according to Ms. Bevel, who was in charge of billing for the office. While the guideline is not an enforceable rule, it establishes a standard that offices should aspire to meet. The inability to get doctors' orders signed frequently stemmed from the fact that the doctors never requested HH in the first place.

157.    On Friday, July 5, 2013, Ms. Kilgore called the Tyler office to inquire about two of her referrals, Patients Doe Seven and Doe Eight. (These referrals were both referrals from the ADC client list.) Ms. Kilgore asked Ms. Sparks why the patients had not yet been admitted. Ms. Sparks explained that the nurse had been attempting to contact the patients for a week, without being able to find them, and that the patients appeared not to be homebound. At that point, Ms. Kilgore began yelling and cursing at Ms. Sparks. Ms. Sparks informed Ms. Carter of the incident via email. (*See* Exhibit 7-C attached hereto.)

## C.  Ms. Sparks' Termination from Employment at IntegraCare

158.     Sometime between July 5 and July 10, 2013, Ms. Sparks informed Ms. Carter via email that two ADC patients, Patients Doe Nine and Doe Ten, that she planned to discharge due to the staff's inability to get orders signed and the patients' lack of qualification for HH. Ms. Carter told Ms. Sparks not to discharge any patients, but to wait until Ms. Carter came to the office, as she wanted to discuss the cases. Ms. Sparks stated that because the office could not obtain doctors' orders for these patients, it was illegal to bill Medicare for these patients.

159.     On Wednesday, July 10, 2013, Ms. Carter was scheduled to meet with the sales team and Ms. Sparks at the Tyler office. Instead, IntegraCare's Vice President of Operations, Teonnie Connell, and the Human Resources director, Angela Carter, arrived in her place.

160.     Ms. Connell said to Ms. Sparks, "A manager needs to be able to manage her staff, and since you are having problems we feel like we need new management in this office." When Ms. Sparks asked which staff she was purportedly having problems managing, Ms. Connell told her that it was the marketing team. However, the marketing team in fact was not under Ms. Sparks' direct supervision, but was actually under the supervision of the Regional Vice President of Sales for the South Division, Mr. Davidson. Mr. Davidson managed around 12 offices, so he did not spend much time training and educating the staff about marketing standards and regulations.

161.     Ms. Sparks asked Ms. Connell, "How can you fire me for lack of ability to manage my staff when the staff members that are the problem are not under my management control?" She went on, "It seems to be convenient that after I filed a formal complaint regarding the Medicare fraud, along with unethical behavior that the sales team is committing, I am the one who gets fired." Ms. Sparks further stated that just a few days prior, Ms. Kilgore had called her

on the telephone screaming and using profane language because Ms. Sparks would not admit a patient that was not homebound.

162.     Ms. Connell stated that the company appreciated the professionalism and hard work Ms. Sparks had provided for the company in her employment there, that she would be eligible for unemployment insurance, and that IntegraCare would not deny her claim. Ms. Sparks was also later paid for her outstanding personal time off, which was not the usual policy at IntegraCare.

163.     Ms. Sparks is informed by Ms. Bevel that, after Ms. Sparks' termination, IntegraCare management sought to continue to bill for both patients whom Ms. Sparks had intended to discharge for lack of proper documentation, Patients Does Nine and Ten. Ms. Bevel resisted, but ultimately left the company before either patient's being discharged. Again, the patients were billed by the company despite Ms. Bevel's protests.

**D.  Kindred's and IntegraCare's Management's Knowledge of and Acquiescence in Illegal Activity**

164.     Defendants have willingly and systematically stolen from Medicare through their illegal and fraudulent billing. Ms. Sparks informed Ms. Carter that IntegraCare was committing Medicare fraud, and Kindred upper management failed to act.

165.     Indeed, as described above, after being expressly notified by Ms. Sparks of IntegraCare's fraud, Kindred declined to call back countless false claims it had specifically identified in IntegraCare's Palestine office, ultimately burying the issue by closing down the offending office. In so doing – even if the original submission of the false claims had not been intentional – Kindred knowingly committed "reverse" FCA violations as to all of the claims it

refused to call back.  The "conversion" of the implicitly false claims strongly supports the False Claims Act allegations.

166.    Despite being informed of the many issues with fraudulent billing and improper marketing and admissions practices, Kindred failed to provide any corrective action, including establishing a system whereby patient charts submitted to the corporate headquarters by local offices would be reviewed to make sure that all required documentation was in fact attached, educating billers about proper billing procedures and standards, and educating marketers regarding proper marketing and Medicare standards for admission to HH services.

167.    In fact, upon Kindred's acquisition of IntegraCare in 2012, Kindred moved two of the three educators IntegraCare employed to teach Medicare regulations in the state of Texas, who might have discovered and/or curtailed the fraudulent scheme, to other Kindred-operated companies in other states. Kindred left only one Medicare educator for 47 offices located from Galveston all the way to El Paso.

168.    Further, on information and belief, since the time Ms. Sparks was terminated from her employment at IntegraCare, Kindred has acquired or merged with other companies besides IntegraCare, and despite Ms. Sparks' having expressly informed Kindred of the wrongful actions of certain employees directly involved in the fraudulent billing to Medicare at IntegraCare, Kindred has retained and promoted such employees while terminating their counterparts at the companies Kindred has acquired or with which Kindred has merged.  IntegraCare management has essentially remained the same throughout all of the mergers and takeovers in the last few years, including a company Ms. Sparks was working for in February of 2015, Gentiva Healthcare. During the transition period, Gentiva upper management was removed as the IntegraCare management remained. For example, Teonnie Connell, who announced to the entire

office that the "roadblock to growth" had finally been removed once Ms. Sparks was terminated, was put in charge of the South Central region after the merger, as the Vice President. Jarrod Davidson, who expressly instructed his marketers to engage in the improper ADC center recruiting scheme, was also retained and promoted in Kindred's corporate structure.  One of the original owners of IntegraCare, Chris Gerard, was also promoted within Kindred, to President of the South Central Region.  This retention and promotion of IntegraCare management over the management of companies acquired and merged with indicates that Kindred condones and approves of the improper recruiting, enrollment and billing practices these employees engaged in at IntegraCare.

 **E.     IntegraCare and Kindred Knowingly Failed to Pay Back Medicare**

169.    As described more fully above, IntegraCare was fully aware that many of the claims it submitted to Medicare were fraudulent. At some centers audited by Ms. Sparks, upwards of 90% of the claims were improperly submitted, as they did not contain the required documentation for payment from Medicare.

170.    IntegraCare knew that it had a legal duty to repay all improperly billed claims within 60 days after they were identified as being improper. Moreover, after auditing multiple centers, Ms. Sparks informed her supervisor that many claims at these centers had been improperly billed to Medicare and should be paid back within 60 days.

171.    The payments for many of these fraudulent claims were not returned to Medicare. Thus, IntegraCare violated the ACA's 60-day payment provision, which acts as a basis for liability under the False Claims Act. *See* 42 U.S.C. § 1320-7k(d)(3).

172.    Further, as described above, Kindred declined to call back countless false claims it had specifically identified in IntegraCare's Palestine office, ultimately burying the issue by

closing down the offending office. In so doing – even if the original submission of the false claims had not been intentional – Kindred knowingly committed "reverse" FCA violations as to all of the claims it refused to call back. Kindred promoted, retained and rewarded all employees, especially the management who participated in these actions and fired or demoted all who did not. This is especially true of Ms. Connell who was not a health professional, who actually fired Ms. Sparks and informed the employees she "removed their roadblock to success."

**COUNT I**
**<u>FALSE CLAIMS – SUBMISSION OF FALSE RECORDS OR STATEMENTS</u>**

173.    Relator repeats and re-alleges each allegation contained in paragraphs 1 through 133 above as if fully set forth herein.

174.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(B), et seq., as amended, or for the maximum penalty allowed by the law.

175.    By the acts described above, Defendants knowingly presented or caused to be presented false or fraudulent claims to the United States Government for payment or approval.

176.    By all the acts described above, Defendants knowingly made, used or caused to be made or used false or fraudulent records and statements, and omitted material facts, to induce the Government to approve and pay such false or fraudulent claims.

177.    Each submission to the Government by Defendants for medical services alleged, or non-eligible patient covered by Medicare home health services represents a false or fraudulent record or statement and a false or fraudulent claim for payment.

178.    These claims are material, because—according to Relator's expert and the fiscal intermediary, Palmetto—during the time of the scheme, Medicare regularly declined to pay claims with incomplete face-to-face forms when it knew that the forms were incomplete.

60

Moreover, IntegraCare final billed claims when the doctor did not approve the patients for home healthcare.

179.     Whether or not IntegraCare called back these claims, the claims were fraudulent the moment they were billed.

180.     The Federal Government, unaware of the falsity of the records, statements and claims made or caused to be made by the Defendants, has paid and continues to pay the claims that would not be paid if not for Defendants' false and fraudulent claims for reimbursement.

181.     By reason of the Defendants' acts, the United States has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

182.     Since at least 2011, and continuing through the present, Defendants intentionally acted to defraud the United States by seeking and/or obtaining reimbursements from Medicare by engaging in and/or knowingly permitting the above fraudulent acts and billing.

## COUNT II
## FALSE CLAIMS – PRESENTATION OF FALSE CLAIMS

183.     Plaintiff and Relator re-alleges, adopts and incorporates by reference paragraphs 1 through 141 as if fully set forth herein.

184.     Defendants knowingly submitted false and fraudulent claims and payment request certifications to agents and officials of the United States Government in violation of 31 U.S.C. § 3729(a)(1)(A). Because of this conduct, the United States and the American taxpayers have suffered millions of dollars in actual damages.

## COUNT III
## FALSE CLAIMS ACT – ANTI-KICKBACK LAW

185.     Plaintiff and Relator re-alleges and incorporates by reference paragraphs 1 through 143 as though fully set forth herein.

186.    As set forth above, Defendants knowingly and willfully paid the employees of an ADC center in Longview, Texas, remuneration prohibited under the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(1), in the form of gifts given by marketers for Defendants to the ADC employees in return for patient referrals.

187.    Even after Relator reported the illegal referral scheme to management at IntegraCare, IntegraCare continued to admit patients and bill for services furnished pursuant to the referrals prohibited by Anti-Kickback, with actual knowledge of the illegality of such compensation arrangement and billings. Since the onset of this lawsuit, Defendants have contended that they were innocent of any wrongdoing or that none of the incomplete bills were actually billed to Medicare. Now, at least six other employees have come forward with knowledge corroborating Ms. Sparks and expanding that knowledge to encompass the actions of Defendants company-wide. Additional allegations have been made concerning Waco, and the Girling division of the company in Tyler, Beaumont, and Houston.

188.    Because of such unlawful referrals, claims and payment, the Defendants have knowingly caused the submission of more than $288,000,000-$540,000,000 worth of charges which Defendants unlawfully billed to Medicare.

189.    As a direct and proximate result of this conduct, the United States and American taxpayers have suffered more than $288,000,000-$540,000,000 in actual damages from 2011 through the present.

## COUNT IV
## FALSE CLAIMS – VIOLATION OF THE AFFORDABLE CARE ACT'S 60-DAY REPAYMENT PROVISION

190.    Plaintiff and Relator re-alleges and incorporates by reference paragraphs 1 through 148 as though fully set forth herein.

191.    By failing to report the instances in which Medicare had been billed when it should not have been billed, due to the improper documentation of patients' qualifications for HH, and by failing to repay the money Medicare paid to Defendants in reliance on such improper billing, Defendants violated the Affordable Care Act's 60-day repayment provision, which requires providers to return Medicare overpayments within 60 days of identifying them. In doing so, Defendants made and used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money to the United States, or knowingly concealed, avoided, or decreased an obligation to pay or transmit money to the United States.

192.    Such false records or statements or knowing concealment, avoidance or decrease of an obligation to pay or transmit money to the United States were made or done knowingly, as defined in 31 U.S.C.§ 3729(a)(1). The ACA specifies that the failure to make a timely refund to Medicare can serve as the basis for False Claims Act liability. 42 U.S.C. § 1320-7k(d)(3).

PENALTIES

193.        The United States is seeking penalties and interests as well as attorney's fees. For each false claim submitted as either a RAP or final bill the U. S. is seeking three times the amount of the erroneous payments. It is believed the erroneous payments amount to between $384,000,000.00 and $712,000,000.00 Plaintiffs are seeking between $1,154,000,000.00 and $2,136,000,000.00 plus the assessment of between $10,781.00 and $21,563.00 for the submission of each actual RAP or final bill submitted by IntegraCare or Kindred during this period. Along with the penalties the plaintiffs are seeking recoverable interests and attorney's fees at the highest amount allowed by law.

194.        This case is important to the Relator and the United States and its taxpayers because it is not merely a case where a company hired an unethical doctor to sign false home

health forms or "simply" one where false recruiting practices were engaged in by the Defendants. Instead this case involves one where an industry leader charged with knowledge of the billing system with both intent and knowledge of the falsity of their actions took advantage of the very system designed to protect them and to encourage them to provide assistance to those in need; elderly, homebound citizens. Instead of properly providing the services required under the act, IntegraCare and Kindred simply signed up supposedly "homebound" patients without completing the billing requirements and signed off on the computer-generated documents that all necessary requirements for billing a RAP or final bill were in place, when as substantiated by the numerous examples attached to the complaint, they were never completed or never completed as billed. The misuse of the billing system by IntegraCare and Kindred is the most blatantly dishonesty false scheme imaginable. When faced with the dishonesty of their actions, Defendants have simply claimed in the face of numerous examples of incomplete billing that they were guilty of only "sloppy" bookkeeping. The Defendants' position is simply not credible. This is especially true when combined with the firing of Simone Sparks for advising that the false billing scheme was illegal and must be stopped. The United States government must rely on a computerized billing system for its Medicare, Medicaid and healthcare payments. The honesty and integrity of the billers is of utmost importance. It is routinely believed that approximately 6% of the Medicare billings contain fraudulent bills. In this case, more than 95% of the bills submitted are believed to contain false billing errors that make payment fraudulent. This makes the case of the utmost importance to the United States and its payment system.

## PRAYER FOR RELIEF

**WHEREFORE,** the United States requests that judgment be entered in its favor and against Defendants as follows:

a.      treble the United States' damages, in an amount to be determined at trial, plus an $11,000 penalty for each overpayment retained in violation of the FCA;

b.      an award of costs pursuant to 31 U.S.C. § 3729(a)(3); and

c.      such further relief as is proper.

**WHEREFORE,** Relator prays for judgment against Defendants as follows:

a.      that Defendants cease and desist from violating 31 U.S.C. § 3729 et seq., and the counterpart provisions of the Texas state statue set forth above;

b.      that this Court enter judgment against Defendants in an amount equal to three times the damages the United States has sustained because of the Defendants actions, plus a civil penalty of not less $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729;

c.      that Relator be awarded the maximum amount allowed pursuant to § 3730(d) of the False Claims Act, and the equivalent provisions of the Texas state statue set forth above;

d.      that Relator be awarded all costs of this action, including attorneys' fees and expenses; and

e.      that Relator recover such other relief as the Court deems just and proper.

Respectfully submitted,


**COLE, EASLEY, SCIBA & WILLIAMS P.C.**
500 N. Water Street, Suite 500
Corpus Christi, TX 78401
(361) 575-0551  Telephone
(361) 575-0986  Fax

By: */s/ Justin L. Williams*_____
     Justin L. Williams
     jlwilliams@ceswlaw.com
     Texas State Bar No. 21555800
     Federal Bar No. 331
     *Attorneys for Relator- Plaintiff,*
     *Simone Sparks*

**WHATLEY KALLAS, LLP**
Joe R. Whatley, Jr.
jwhatley@whatleykallas.com
Texas State Bar No. 24003554
720 East Durant Avenue, Unit E6
Aspen, Colorado, 81611
(205) 279-1626 phone
(800) 922-4851 facsimile


**PLAINTIFF HEREBY RESPECTFULLY DEMANDS A TRIAL BY JURY.**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have on this 12th day of October, 2016, electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*/s/ Justin L. Williams*_____
Justin L. Williams
